UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRIAN STONE,

**REPORT AND**
**RECOMMENDATION**

Plaintiff,

12-CV-239
(TJM/VEB)

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.
_____

## I. INTRODUCTION

In April of 2005, Plaintiff Brian Stone applied for disability insurance benefits ("DIB")

under the Social Security Act.  Plaintiff alleges that he has been unable to work since

December of 2003 due to physical and psychological impairments. The Commissioner of

Social Security determined that Plaintiff became disabled under the Social Security Act as

of February 1, 2008, but was not disabled prior to that date.

Plaintiff, by and through his attorney, Stephen J. Mastaitis, Esq., commenced this

action seeking judicial review of the unfavorable portion of the Commissioner's decision

pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

 On March 22, 2013, the Honorable Gary L. Sharpe, Chief United States District

Judge, referred this case to the undersigned for a Report and Recommendation pursuant

to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 20).

## II. BACKGROUND

The relevant procedural history may be summarized as follows:

On April 22, 2005, Plaintiff applied for DIB under the Social Security Act, alleging that he had been unable to work since December 7, 2003. (T at 176-77).[1]  The application was denied initially and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on February 22, 2010, before ALJ David Z. Nisnewitz. (T at 19).  Testimony was received from Don Schader, a vocational expert.  (T at 19-53). Plaintiff did not appear.  (T at 21-22).  A supplemental hearing was held on June 28, 2010. (T at 54).  Testimony was received from Dr. Donald Goldman, a medical expert. (T at 54-79).  Plaintiff was again not present, but authorized his attorney to proceed on his behalf. (T at 56-57, 149).

On July 12, 2010, the ALJ issued a written decision finding that Plaintiff became disabled as of February 1, 2008, but was not disabled prior to that date.  (T at 4-16).  The ALJ's decision became the Commissioner's final decision on December 6, 2011, when the Social Security Administration Appeals Council denied Plaintiff's request for review. (T at 1-3).

Plaintiff, by and through his counsel, commenced this action challenging the unfavorable portion of the Commissioner's decision by filing a Complaint on February 6, 2012. (Docket No. 1).   The Commissioner interposed an Answer on June 13, 2012. (Docket No. 8).  Plaintiff filed a supporting Brief on August 30, 2012. (Docket No. 15).  The Commissioner filed a Brief in opposition on October 29, 2012. (Docket No. 16).

---

[1]Citations to "T" refer to the Administrative Transcript.  (Docket No. 10).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.[2]

For the reasons below, it is recommended that Plaintiff's motion be granted, the Commissioner's motion be denied, and this case be remanded for further proceedings.

## II. DISCUSSION

### A.    Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct.

---

[2]General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings."

1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir.1982).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.[3]

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n. 5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir.1984).

---

[3]This five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

**B.    Analysis**

**1.    Commissioner's Decision**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 7, 2003 (the alleged onset date) and met the insured status requirements of the Social Security Act through December 31, 2008 (the "date last insured"). (T at 9). The ALJ concluded that Plaintiff had the following severe impairments: status post lumbar laminectomy with lower back pain with radiation into the right upper extremity, knee pain, and depression. (T at 9-11).

The ALJ determined that Plaintiff's medically determinable impairments did not meet or equal one of the impairments listed in Appendix I of the Regulations (the "Listings") prior to February 1, 2008. (T at 11-12).  However, the ALJ concluded that as of that date, Plaintiff did satisfy the impairment set forth at § 1.04 of the Listings (Disorder of the Spine). (T at 11-12).

The ALJ found that, prior to February 1, 2008, Plaintiff retained the residual functional capacity to perform the full range of sedentary work. (T at 12-15).  The ALJ determined that Plaintiff could not perform his past relevant work as a dining room

manager, food service manager, or his employment in advertising at any time relevant to the application for benefits. (T at 15).

Considering Plaintiff's age (40 years old on the alleged onset date), education (three years of college), and work experience (some transferrable skills), and residual functional capacity (sedentary work, prior to February 1, 2008), the ALJ determined that Plaintiff was not disabled prior to February 1, 2008. (T at 15-16).

As noted above, the ALJ's decision became the Commissioner's final decision on December 6, 2011, when the Social Security Administration Appeals Council denied Plaintiff's request for review. (T at 1-3).

## 2. Plaintiff's Argument

Plaintiff challenges the unfavorable portion of the ALJ's residual functional capacity assessment. In particular, Plaintiff contends that the ALJ did not properly evaluate the medical evidence and that the ALJ's residual functional capacity determination was not supported by substantial evidence.

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20

C.F.R. § 404.1545(a).  An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations.  LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y.1990).

As discussed above, the ALJ determined that prior to February 1, 2008, Plaintiff retained the RFC to perform the full range of sedentary work. (T at 12-15).  When formulating his RFC determination, the ALJ discounted the opinions of Plaintiff's treating physicians' to the extent they found disabling restrictions prior to February of 2008.  The ALJ found Plaintiff's allegations regarding the intensity, persistence and limiting effects of his symptoms "not entirely credible." (T at 14).

This Court finds that the ALJ's decision to fix February 1, 2008, as the earliest date on which Plaintiff's impairments became disabling was not supported by substantial evidence and should be revisited on remand.

### a.    Treatment Gaps

First, the ALJ placed undue emphasis on treatment gaps without adequately developing the medical record.

Dr. Fred Scialabba, a treating neurosurgeon, noted that Plaintiff was injured at work in October of 1992 and was thereafter treated for ongoing pain. (T at 336).  According to Dr. Scialabba, Plaintiff underwent a lumbar laminectomy in August of 2004 and experienced improvement thereafter. (T at 336).  In September of 2004, a week after Plaintiff's surgery, Dr. Scialabba reported that Plaintiff was not experiencing any pain in his leg.  He had "some numbness over the tops of three toes and his left leg," but the "remainder of [the] exam [was] absolutely unremarkable." (T at 275).

A month after the surgery, Dr. Scialabba described Plaintiff as "temporarily totally

disabled," but noted that he demonstrated negative straight and flexed leg raising bilaterally. A motor exam showed good strength in every muscle groups of both lower extremities, with unremarkable sensory examination and normal reflexes. (T at 273).

Plaintiff then relocated to Croatia. In a December 2004 treatment note, Dr. Anton Tudor, a treating orthopedist, reported that Plaintiff had "a severe pain in his neck and beck [*sic*]" and felt "cold in his right foot." (T at 260). Dr. Tudor indicated that Plaintiff found walking on his right foot "more difficult" and noted that he was receiving physical therapy. (T at 260). In March of 2005, Dr. Tudor opined that Plaintiff had a "full permanent disability," while noting that his back pain had "somewhat lessen[ed]" and that he had experienced improved mobility. (T at 345).

This is followed by a significant gap in treatment records. In August and October of 2006, Dr. Anita Bezevan, a treating physician, opined that Plaintiff was "totally permanently disabled for work." (T at 266-67). Dr. Bezevan reported that Plaintiff was "under full care of an orthopedist and physiotherapist." (T at 266-67).

There is then another gap in the treatment records until January of 2008, when Dr. Tudor described Plaintiff's condition as "[s]ubjectively and clinically . . . worse" and recommended that Plaintiff be managed by a neurosurgeon. (T at 259).

The ALJ found these gaps in the treatment records extremely significant. (T at 12-14). In fact, the ALJ considered the gaps to be evidence that Plaintiff's treatment was "sporadic" and determined that Plaintiff "did not come under active medical care until 2008." (T at 14).

However, in August and October of 2008, Dr. Bezevan reported that Plaintiff was "under full care of an orthopedist and physiotherapist." (T at 266-67). In September of 2008,

8

Dr. Bezevan stated that Plaintiff had been a "regular patient . . . dating back to 2002." (T at 334). These statements suggest the "treatment gap" might be the result of absent medical *records*, as opposed to an absence of medical treatment. (T at 266-67). Many of the documents included in the record were translations of treatment notes from Plaintiff's Croatian physicians. Thus, it is not implausible that additional records were either difficult (or prohibitively expensive) to obtain.

The ALJ did not adequately explore this issue or seek an explanation from Plaintiff (or his counsel) regarding the gap in treatment records. This was error. SSR 96-7p provides, in pertinent part, that a claimant's allegations of disabling limitations "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed." Under that ruling, however, an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id.

One might reasonably expect Plaintiff's counsel to have addressed the medical records gap either by seeking to obtain additional records or providing the ALJ with some excuse or explanation. However, the Second Circuit has shown a willingness to interpret broadly the ALJ's duty to develop the record, even in cases where the claimant is represented by counsel. See Vincent v. Comm'r of Social Security, 651 F.3d 299, 305 (2d Cir. 2011)("The duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'")(citations omitted). As such, under the circumstances, the ALJ's failure to seek

a further explanation for the medical records gap was error and a remand should be ordered.

### b.    Treating Physicians' Opinions

Second, the ALJ's consideration of the treating physicians' opinions was flawed.

Plaintiff's treating physicians' consistently described his condition as disabling throughout the relevant time period and, in particular, prior to February of 2008. (T at 259, 260, 266, 267, 334, 336, 345).  Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.2000).[4]

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  In this regard, the ALJ should consider the following factors when determining the proper weight to afford the opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143

---

[4]"The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

F.3d 115, 118 (2d Cir.1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

This Court recognizes that the ultimate decision regarding disability is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e); SSR 96-5p. In addition, the treating physicians' disability declarations were largely made in the workers' compensation context, which involves different standards than the Social Security disability standards. See Rosado v. Shalala, 868 F.Supp. 471, 473 (E.D.N.Y.1994); see also Crow v. Comm'r of Soc. Sec., No.01-CV-1579, 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (the ALJ was not required to adopt a treating physician's opinion that Plaintiff was "totally" disabled, in part, because "the opinions were rendered in the context of [claimant's] W[orkers'] C[ompensation] claim, which is governed by standards different from the disability standards under the Social Security Act").

However, during the period prior to February of 2008, Plaintiff's treating physicians reported "severe pain" (T at 260), a worsening condition (T at 261), and "right leg pain," which did not improve after treatment (T at 345). Also, while not dispositive, the fact that Plaintiff's treating physicians were consistently describing him as totally disabled was of some probative value.

The ALJ discounted the treating physicians' assessments primarily because of the treatment gap and because he considered Plaintiff's treatment (primarily physical therapy) to be "conservative." (T at 14-15). This was error. As outlined above, the record was not adequately developed concerning the medical records gap. In addition, a treating physician's opinion should not be discounted simply because the ALJ considers the treatment "conservative." See Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir.2008)("Nor is the opinion of the treating physician to be discounted merely because he has

recommended a conservative treatment regimen. The ALJ and the judge may not 'impose[
] their [respective] notion[s] that the severity of a physical impairment directly correlates
with the intrusiveness of the medical treatment ordered.... [A] circumstantial critique by
non-physicians, however thorough or responsible, must be overwhelmingly compelling in
order to overcome a medical opinion.'")(quoting Shaw v. Chater, 221 F.3d 126, 134-35(2d
Cir.2000).

More importantly, the ALJ's selection of February 1, 2008 as the date on which
Plaintiff's condition was disabling was not adequately reconciled with the treating
physicians' opinions. To wit, the ALJ determined that Plaintiff's condition became disabling
only after February 1, 2008, without asking Dr. Bezevan and/or Dr. Scialabba (both of
whom treated Plaintiff before and after that date) for their opinion on that question.

In September of 2008, Dr. Bezevan diagnosed osteoarthritis, resulting from a 2003
injury. (T at 334). She also noted that Plaintiff was being treated for depression, which she
attributed to his injury and inability to work. (T at 334). The doctor opined that Plaintiff's
pain and discomfort were likely permanent, with radiculopathy demonstrated on an
EMG/nerve conduction study. (T at 337). She noted that Plaintiff's arthritis and depression
added to his overall disability and opined that Plaintiff was "100%" disabled. (T at 334-35).

In December of 2008, Dr. Scialabba reported that Plaintiff had experienced a gradual
recurrence of pain and discomfort in his right leg. (T at 336). A September 2008
EMG/nerve conduction study demonstrated the presence of chronic radiculopathy on the
right of the L5 nerve root. (T at 336). Dr. Scialabba indicated that Plaintiff's pain and
discomfort were likely permanent, with further surgery not recommended. He described
Plaintiff as "100%" disabled. (T at 336).

12

Neither of these reports indicated that Plaintiff's condition became significantly worse in February of 2008 and both opinions can fairly be read as describing significant pain dating back several years. In particular, Dr. Scialabba reported (in December of 2008) that Plaintiff had experienced a "gradual recurrence of pain and discomfort in his leg" over "the past 3 years." (T at 336). Under the circumstances, before determining that Plaintiff's condition became disabling only as of February 2008, the ALJ should have contacted the treating physicians to determine their assessment as to whether, how, and when the nature and extent of Plaintiff's condition changed over time.

### c. Dr. Goldman's Opinion

Lastly, the ALJ cited as primary authority for his decision the fact that Dr. Donald Goldman, the Commissioner's orthopedic expert, concluded that Plaintiff's impairments were disabling after February 1, 2008, but not prior to that date. (T at 12). As outlined below, Dr. Goldman's actual testimony was far more equivocal and less reliable.

Dr. Goldman appeared (by telephone) at the first administrative hearing held on February 22, 2010, and testified that he could not make a judgment based on the record before him. (T at 42). The ALJ then excused Dr. Goldman and indicated that he would rule without the doctor's opinion. (T at 43).

Dr. Goldman also appeared at the second administrative hearing held on June 28, 2010. He asked to question Plaintiff, but was advised that Plaintiff was in Croatia and therefore would not be appearing or testifying. (T at 57). Plaintiff's counsel indicated that he had obtained an affidavit from his client. (T at 57-58). Dr. Goldman had not received the affidavit and it was faxed to him while the hearing was taking place. (T at 58, 61). The ALJ,

*sua sponte*, instructed Dr. Goldman that he should "remember it's the claimant's affidavit and it tends to be self-serving." (T at 58). Dr. Goldman asked for a moment to "speed read" the affidavit. (T at 63). The amount of time he actually spent reading the affidavit is unclear, but it was apparently rather brief, because the ALJ remarked: "You read the affidavit already? You read the entire affidavit already?" (T at 63).

When asked, Dr. Goldman expressed hesitancy about his ability to state what Plaintiff's RFC was based on the evidentiary record, explaining that he would need additional information from the treating physicians. (T at 65-66).[5] The ALJ then stated that he could not order a consultative examination because Plaintiff was out of the country. He reminded Dr. Goldman that Plaintiff had the burden of proof and asked him to give an opinion based upon the existing record. (T at 67).[6] Dr. Goldman then said that he could "only conclude from the kind of surgery [Plaintiff] had and this limited followup that he could be able to work with restrictions." (T at 67-68). On further questioning from the ALJ, Dr. Goldman opined that Plaintiff could perform the basic exertional demands of sedentary work. (T at 68-69).

As Plaintiff's counsel questioned Dr. Goldman, it was revealed that the doctor had not received certain recent medical reports. (T at 70). The hearing was adjourned briefly and the records were faxed to Dr. Goldman. (T at 70-72). When the hearing resumed, Dr. Goldman explained that the additional information (including MRIs) showed additional

---

[5]The ALJ asked Dr. Goldman whether he could offer an opinion as to what he "believe[d] the claimant's [RFC] is based on what restrictions are evidenced objectively in the record." (T at 65). Dr. Goldman replied: "No, I cannot, Your Honor. I understand what his initial impairments were. The question is this doesn't tell me from a clinical point of view whether they exceeded 12 months or not." (T at 65).

[6]The ALJ did not discuss, and apparently did not consider, that the treating physicians might have been re-contacted for some of the additional information Dr. Goldman was seeking.

hernitated discs that were not present when Plaintiff had his initial surgery, as well as chronic scarring with nerve involvement. (T at 72). Dr. Goldman then opined that, based upon this new information, Plaintiff's impairments met the requirements of the impairment listed at §1.04 (A) of the Listings.[7]

The ALJ then pressed Dr. Goldman to determine the date on which Plaintiff's impairments satisfied the Listing. (T at 73). Dr. Goldman responded that the report he was reviewing was from 2008, but noted that "[t]his appears to be ongoing from following his initial surgery." (T at 73). The ALJ asked whether it might take time for the new conditions to develop after surgery. (T at 74). Dr. Goldman responded that they might "develop in as early as several months following the surgery." (T at 74). The ALJ then asked Dr. Goldman whether he knew when Plaintiff's conditions developed. Dr. Goldman initially responded: "No, that I can't tell . . . there's gaps of time here." (T at 74). He then reported that the earliest document he had documenting arthritic changes with narrowing of the spine was from February 2008. (T at 74). The ALJ then immediately asked Plaintiff's counsel whether he would stipulate to an onset date of February 2008, which counsel declined. (T at 75). After some additional questioning, Dr. Goldman was excused. The ALJ told Plaintiff's counsel that he was going to award benefits as of February 2008 "based on Doctor Goldman's testimony." (T at 78). Counsel advised that he could not stipulate to this result without his client present and the hearing was adjourned. (T at 78).

---

[7] Impairments listed in Appendix 1 of the Regulations (the "Listings") are "acknowledged by the [Commissioner] to be of sufficient severity to preclude" substantial gainful activity. Accordingly, a claimant who meets or equals a Listing is "conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir.1995); see 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

Reading the ALJ's decision in isolation, one would likely believe that Dr. Goldman reviewed a complete medical record throughly and rendered a carefully reasoned and definite opinion that Plaintiff retained the RFC to perform at least sedentary work prior to February 1, 2008, and became disabled only after that. As the summary above demonstrates, however, Dr. Goldman was provided with an incomplete record, spent a limited amount of time reviewing critical pieces of evidence (which had not originally been provided to him), and referenced the February 2008 date (which was apparently the date of an MRI report) (a) after twice expressing reluctance about offering an opinion, (b) after the ALJ demanded that he provide an opinion, (c) without stating categorically that Plaintiff's condition could not have been disabling prior to that date, and (d) was subjected to curious reminders as to the self-serving nature of Plaintiff's evidence and the Plaintiff's burden of proof.

This Court sympathizes with the ALJ, who was dealing with the challenging situation of a claimant located out of the country and an evidentiary record with significant gaps. However, when faced with Dr. Goldman's reluctance to determine the onset date based on the existing record, the ALJ should have sought to further develop the record, rather than demanding an immediate answer from the doctor on a question as fundamental as the disability onset date.

In other words, having determined that this Plaintiff had disabling impairments, it was incumbent upon the ALJ to ensure that the onset date was determined as correctly and carefully as possible. Although the ALJ noted, accurately, that a social security claimant bears the burden of proof on this issue, the ALJ also has an "affirmative duty to develop the record and seek additional information . . . *sua sponte*, even if plaintiff is represented by

counsel." Colegrove v. Comm'r of Soc. Sec., 399 F. Supp.2d 185, 196 (W.D.N.Y.2005); see also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e) (1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source ... does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").

Here, as outlined above, an obvious option would have been to re-contact Dr. Bezevan and/or Dr. Scialabba to ask for their assessment of the onset date. In other words, the ALJ should have asked the treating physicians to answer the same question that he insisted be answered by Dr. Goldman. Given that they treated Plaintiff both before and after February of 2008, they would have been in the best position (and, in any event, in a much better position than Dr. Goldman) to answer the question accurately. This Court must conclude that the ALJ's failure to develop the record in this regard and his heavy reliance on Dr. Goldman's testimony concerning the date are reversible errors. A remand is therefore recommended.

### 3. Remand

"Sentence four of Section 405 (g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405 (g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." Kirkland v. Astrue, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008). Given the deficiencies in the record as outlined above, it is

recommended that the case be remanded for further proceedings consistent with this Report and Recommendation.

Lastly, the Commissioner should consider assigning the case to a different ALJ on remand. The ALJ was evidently frustrated by Plaintiff's absence from the country and by the failure of Plaintiff and his counsel to adequately develop the record. The ALJ's decision to press Dr. Goldman for an opinion even after Dr. Goldman expressed reluctance to do so is evidence of that frustration, as is the ALJ's unsolicited suggestion to Dr. Goldman that Plaintiff's affidavit was "self-serving." While the Court understands the ALJ's frustration, he should not have allowed it to influence the proceedings and decision. As such, on remand, the Commissioner should consider whether "a fresh look by another ALJ would be beneficial[.]" <u>Vicari v. Astrue</u>, 05 CV 4967, 2009 WL 331242, at *6 (E.D.N.Y. Feb. 10, 2009).

## IV. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Commissioner's motion be denied, Plaintiff's motion be granted, the decision of the Commissioner be reversed, and this case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405 (g) for further administrative proceedings consistent with this Report and Recommendation.

Respectfully submitted,

Dated: June 4, 2013

Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge

## V. ORDERS

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY

Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not*, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

SO ORDERED.


Dated: June 4, 2013

      Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge